MARSH

*v.*

MARSH.

1. A judgment of divorce should never be pronounced on doubtful proofs.

2. The evidence in this case, *Held*, to establish the adultery of the defendant.

On final hearing on pleadings and proofs.

*Mr. William D. Daly,* for complainant.

*Mr. John Linn,* for defendant.

THE VICE-CHANCELLOR.

The complainant seeks to be divorced from his wife on the ground of adultery. The adultery is alleged to have been committed while the parties resided in Jersey City. The husband's business kept him in New York City three nights of each week until near midnight. The other four were spent at home. The defendant and her alleged paramour became acquainted about the 1st of June, 1876. From about that time they were together two or three evenings of each week, generally, if not always, when the complainant was absent. They met either in the rooms of Mr. Cook, who occupied the lower part of the house, in the upper part of which the complainant had three rooms, or on the street. He never visited her in her own rooms.

A servant girl, who lived in the complainant's family during the whole period of the intimacy, swears that the person with whom the adultery is charged to have been committed, came to Mr. Cook's almost every night; if the complainant was at home, the defendant would stay in, but if he was away she would go down and they would go out

together; that she threw notes to him out of the window; that she attended evening .picnics with him, and on one such occasion, when she was with them in charge of the defendant's babe, the defendant told her to address her as the wife of the alleged paramour, by calling her Mrs. ——, mentioning his name.    She further testified, when the defendant went out with this person in the evening, she borrowed her under-garments, and returned them so soiled as not to be fit to be used. .This witness also swears to declarations by the defendant, fully admitting the adultery.

It is undisputed that on the evening of July 13, 1876, these parties met, by previous appointment, on a street corner in Jersey City, walked a short distance together, then took a street-car to the elevator, by which the ascent to Jersey City Heights is made, ascended by the elevator and passed along a public way for nearly a quarter of a mile, then turned into a pathway and went to a rock situated in a secluded spot, distant from one hundred to one hundred and fifty yards from the public way.    The husband had requested three persons to watch them on this occasion, two of whom pursued them up to near the rock. One of them swears, after they reached the rock, he crawled up to within eight or nine yards of them, and saw them in a position which, if his evidence is believed, establishes their guilt beyond all doubt.

The alleged paramour has been examined as a witness on behalf of the complainant.    He swears he never had criminal intercourse with the defendant, but admits that he confessed to the complainant he had had, but says the confession was made under fear of a threat that he could be sent to state prison, the complainant representing to him that he. could prove the adultery by four witnesses.    He also admits he knew the complainant was unwilling he should associate with his wife, and had "hard feelings" against him for doing so.    He also admits, that since this suit was commenced, the defendant has written several notes to him, which were delivered by an unknown man, and that after

reading them they were returned to the unknown person, at his request. He also says, in September last the postman left at his residence a letter addressed to him, without signature, dated Brooklyn, September 12, 1876, in which the writer says :

"You poor, dear darling, you looked so pale and thin, when I saw you last, my heart ached for you. It made a cold chill run through me, for if any thing should happen to you, I should not care to live another minute, for I love you so. My life would be a blank without you. If I was sure I was all in all to you, I would be happy and reconciled to what may come. I have several times tried to get out of you what your intentions are towards me, but I never could get you to tell me plainly what you intended to do after this thing is over. Now, why do you not speak plain, right out, and put my mind at ease, for if this uncertain affair goes on much longer I shall yield to a great temptation put before me. You know that I love you, for I have proved it to you in many ways. * * * * * * * I am anxious to see you. Answer this right away, and speak your mind to me in your letter; it will reach no other hands but mine, and I will return it to you Thursday evening if you come over, and I shall expect you to return mine. It is the safest and best way. Oh! how my arms are aching to be around your neck, my precious darling. * * * * * I remain as ever, yours till death."

He further says, he has never seen the defendant write, but he subsequently stated he had received notes from her, both before and after this letter was received, and that when he received this he supposed she had written it. If their intercourse had been pure and innocent, it would have been impossible for such a thought to enter his mind. He could not have supposed she wrote it unless he knew her mind and heart were utterly depraved. It contained a plain demand upon him to declare whether, when this divorce suit was over, he intended to marry her or not; and also a declaration, as plain as language could make it, that their relations had been criminal. A wife who writes to a man, not her husband, and with whom she has associated nightly at other places than her home, in the absence of her husband, "You know that I love you, for I have proved it to you in many ways." "My arms are aching to be around

Marsh v. Marsh.

your neck, my precious darling," assures him of a lustful love, and reminds him that he has had many proofs of it in their licentious enjoyments. The letter reminded the paramour of the repeated attempts the writer had made to find out what were his intentions towards her; it confessed a lecherous love for him, and appealed to his recollections for the many proofs that had been given of it. It was impossible for him to believe the defendant had written it, unless all these were to him internal evidences of its authenticity. It spoke of secret transactions, in which they alone were the actors, and unless its statements were known to him to be truthful, he could not have supposed she had written it.

The complainant's brother, who swears he is acquainted with the defendant's handwriting, says he believes the letter was written by the defendant. Her father swears he does not think she wrote it, while the person to whom it was sent, and who had been in the habit of receiving notes from her, says, when he received it he supposed she had written it. I have compared it again and again with a letter in evidence, admitted to have been written by the defendant, and I am compelled to say I cannot get rid of the conviction they were both written by the same hand.

Civilized government everywhere rests upon the marriage relation. The courts should never dissolve this relation except upon full, clear and conclusive proof of the cause of divorce. A judgment of divorce should never be pronounced upon doubtful proofs. If mistakes are committed, they should be committed in favor of the continuance of the relation, no matter how painful the consequences are to the immediate parties concerned. Suitors should understand the marriage tie is sacred and inviolable in the eye of the law, and will never be broken by the courts, except the proofs make the path of duty plain and clear. I have considered this case with an earnest desire to ascertain the truth. I confess, I have examined it with a hope that I might be able to reach the conclusion that the conduct of

the defendant had been only imprudent, but not criminal. But the proofs will not permit it. They force me to the conclusion that the defendant is an adulteress, and I must so declare. A divorce *a vinculo* will be advised.